UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YARA MAALAININE, | **COMPLAINT** |
| Plaintiff, | |
| vs. | **Case No.** 1:18-cv-10398 |
| GREENSLATE, LLC; JOHN FINN ASSOCIATES LLC; and JOHN FINN SOFTWARE | **JURY TRIAL DEMAND** |
| Defendants. | |

## PRELIMINARY STATEMENT

Plaintiff Yara Maalainine, former Director of Information Technology for Defendants, brings this action for breaches of Plaintiff's employment agreement, equity agreement and profit-sharing agreement. Defendants breaches are particularly egregious given the fact that the agreements are memorialized in writing, Plaintiff took a pay cut as consideration for an award of equity and profit sharing, and Defendants paid out other individuals who were part of the same equity and profit-sharing agreements.

Plaintiff Yara Maalainine, by his attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon knowledge as to himself and information and belief as to all other matters, the following:

## NATURE OF ACTION

1.      Plaintiff Yara Maalainine ("Plaintiff" or "Mr. Maalainine") seeks compensatory and punitive damages against Defendants Greenslate LLC ("Greenslate"), John Finn Associates ("JFA") and John Finn Software ("JFS") (Greenslate, JFA and JFS are referred to herein as the "Companies") arising out of Defendants' breach(es) of contract(s) and/or enforceable promises to pay Plaintiff 5% profit sharing in the Companies and award Plaintiff a 5% equity stake in the

Companies (which was 2.5% percent vested at the time Plaintiff left his employe), and Defendants' willful refusal to pay Plaintiff his earned and non-discretionary retention bonus for work performed as an employee on behalf of the Defendants.

2. Plaintiff now brings suit for monetary damages, declaratory relief, interest, attorneys' fees, and costs for Defendants' breaches of contract and, in the alternative, quasi-contract claims including unjust enrichment, and quantum meruit. Plaintiff also brings a claim for his unpaid retention bonus under the New York Labor Law ("NYLL"). Plaintiff also seeks equitable remedies and injunctive relief.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because there is complete diversity between the Plaintiff (a resident of New Jersey) and Defendants (residents of New York and/or Delaware) and because the amount in controversy exceeds $75,000.

4. Since the unlawful conduct complained of herein occurred within the Southern District of New York, venue is proper within this district pursuant to 28 U.S.C. § 1391(b) and (c).

5. This court has personal jurisdiction over the Defendants because they each conduct business within New York and committed the acts set forth herein within New York.

## PARTIES

6. Plaintiff presently resides in Jersey City, New Jersey. At all times during his employment with Defendants, Plaintiff's office, which he regularly worked out of, was located at 150 West 30th Street, New York.

7. At all times that he worked for Defendants, his dedicated office was located in the Defendants' headquarters at 150 West 30th Street, New York, New York.

8. At all relevant times mentioned herein, Defendant Greenslate is a corporation incorporated under the laws of Delaware with its principal place of business in New York, New York.[1]

9. At all relevant times mentioned herein, Defendant John Finn Associates ("JFA") is a corporation incorporated under the laws of New York with its principal place of business in New York, New York.

10. At all relevant times mentioned herein, Defendant John Finn Software ("JFS") is a corporation incorporated under the law of New York York with its principal place of business in New York, New York.

11. Greenslate, JFA and JFS are all owned and operated by John Finn.

12. JFA is responsible for all the accounting services that Greenslate provides for the entertainment industry. As such, and profits derived from the accounting services offered by Greenslate flow through JFA.

13. JFS is a holding company which owns the software and other intellectual property used by Greenslate.

14. The profits for Greenslate are shared by and run through either JFA, JFS or both.

15. At all times during Plaintiff's employment, JFA, JFS and Greenslate maintained a core of unified operational activities as an organized business system directed to the accomplishment of a common business purpose.

---

[1] Greenslate LLC previously did business under the name "Indiepay LLC." In or about the spring of 2017, Indiepay LLC was rebranded as Greenslate LLC. Any reference to Greenslate LLC herein specifically refers to and includes any prior time periods when the company was called Indiepay LLC.

16. Further, the Companies were operationally and financially interdependent, and entered into agreements with one another regarding the flow of profits between the Companies, management of jointly employed personnel, payment of debts, extension of credit, and tax and legal matters jointly impacting the Companies.

17. The Companies maintained a common operational purpose notwithstanding the formation of multiple limited liability companies under John Finn's direction and control and intended to remain operationally interdependent as a matter of business purpose and pursuant to the intended design of the founding principal – John Finn.

## FACTUAL ALLEGATIONS

**Plaintiff's Offer and Acceptance of Employment**

18. On or about April 20, 2008 Mr. Maalainine accepted an offer of employment with Defendants to be System and Network Admin for Greenslate, which at the time was called Indiepay.

19. In or about 2009, Plaintiff was promoted to Director of Information Technology.

20. Greenslate is, and at all times was, a production payroll company that uses technology to streamline the accounting and payroll processes in the entertainment industry.

21. In 2016 Greenslate serviced approximately 17% of all American films with budgets between $1 and $15 million, including both Academy Award Best Picture and Documentary winners, *Moonlight* and *O.J.: Made in America*.

22. In his role as Director of Information Technology, Mr. Maalainine was responsible for, among other things, (i) managing, implementing and maintaining the IT department infrastructure; (ii) participating in technical research and development to enable continuing innovation within the IT infrastructure; (iii) assisting in technical strategy, research &

4

development within the IT department life-cycle, technical analysis and design; and (iv) supporting operations staff in executing, testing and rolling-out the solutions.

23. Plaintiff performed diligently in this role from his start date in April 2008 through his departure from Greenslate in October 2018.

**Plaintiff Agrees to a Salary Reduction in Exchange for 5% Equity in Greenslate, JFS and JFA.**

24. In or about April 2012, the Companies were struggling financially.

25. As such, John Finn the Founder and Chief Executive Officer ("CEO") of the Companies, asked Mr. Maalainine and four (4) other high-ranking employees[2] to take a pay cut in exchange for up to 5% equity in the Companies and 5% profit sharing in the Companies.

26. During the discussions about equity in exchange for a pay cut, John Finn explained to Plaintiff that, in exchange for accepting a pay cut, and with the intent to ensure his continued retention despite having to take a pay cut, Plaintiff (as well as the other four individuals), as consideration for agreeing to a reduced salary and bonus for as long as deemed necessary, would receive a 5 percent (5%) equity ownership in the Companies as well as 5 percent (5%) of the net profit of the Companies.

27. After a prolonged discussion regarding the offer of equity and profit sharing in exchange for salary reductions, the parties came to a final agreement as to the terms of the offer, which Plaintiff than accepted in a signed writing maintained by Mr. Finn.

28. In fact, on April 2, 2013, John Finn emailed Mr. Maalainine stating, in sum and substance, "my attorney stevens kasselman will be in this week to draft up a document to confirm our understandings going forward."

---

[2] The salary reduction in exchange for equity was presented to: (1) Plaintiff, (2) David Reynolds, the Chief Financial Officer ("CFO"), (3) Mike Leiba, the Chief Operating Officer ("COO"), (4) Celeste Jackson, the Senior VP of Client and Industry Relations, and (5) Steve Boyle, Accounting Manager.

29. In or about May 2012 Plaintiff was presented with a contract regarding the agreed to terms – specifically his salary reduction in exchange for a award of 5% equity in the Companies that would vest over a period of time.

30. Plaintiff recalls signing the contract, which entitled him to 5% equity in the Companies.[3]

31. Plaintiff was not provided with a copy of the contract to maintain for his own records.

32. Plaintiff performed under the contract by accepting the salary reduction, which was actually reduced for a period of time by approximately twenty percent (20%).

33. The following year, the Companies financial situation had improved and Plaintiff's salary was restored.

34. The equity agreement between the parties included a vesting schedule whereby Plaintiff, by agreeing to the salary reduction and actually having his salary reduced for as long as necessary, would be awarded 5% equity in the Companies, which would become fifty percent (50%) vested by January 1, 2018.

35. As such, on January 1, 2018, Plaintiff became contractually entitled to 2.5% equity in the Companies.

36. To date, Defendants have refused to honor Plaintiff's equity arrangement.

37. In fact, on or about 2014, when Plaintiff's employment contract came up for renewal, he inquired about including his equity arrangement as a term within his employment

---

[3] When presented with the offer of equity in exchange for a salary reduction, Celeste Jackson turned it down and continued to be paid at her base salary rate; Steve Boyle accepted the salary reduction and equity offer, but was terminated for cause and forfeited any entitlement to equity; David Reynolds accepted the salary reduction and equity offer, and when he left the Company, upon information and belief, he was paid out the equity amounts which had been offered and had vested; and Mike Leiba accepted the salary reduction and equity offer, and upon information and belief, he still retains his 5% equity interest, which to date would be 2.5% vested.

contract.

38. At that time John Finn informed Plaintiff that he did not intend to honor the equity agreement.

39. However, Plaintiff had already performed under the equity contract by accepting the 20% salary reduction and as such is, and was at all times, entitled to the 5% equity award in exchange for the salary reduction, which Plaintiff took.

40. Mr. Finn gave no reason for breaching the agreement to provide Plaintiff with 5% equity, except to say, in sum and substance, that "no one was getting it" anymore.

41. However, Plaintiff has since learned that this was not true. At least two other people have been awarded their equity amounts, as offered in oral and written agreements.

42. First, David Reynolds was terminated, at which time, pursuant to the contract, his equity became fully vested.

43. Second, upon information and belief, Mike Leiba was awarded his full 5% equity in the Companies.

44. Upon information and belief, Plaintiff's 5% equity in the Companies is valued at approximately $4,000,000 to $6,000,000.

**Defendants Failed to Pay Plaintiff his Earned Profit Sharing for 2014 to 2017 and Underpaid Plaintiff's Earned Profit Sharing for 2012 and 2013.**

45. As mentioned above, as part of the contract that contained the equity award, Defendants also offered, and Plaintiff accepted, 25% profit sharing, to be equally divided amongst the 5 individuals offered equity in exchange for reductions in their salary – Plaintiff, David Reynolds, Mike Leiba, Celeste Jackson, and Steve Boyle.

46. Specifically, in or about October 2012, John Finn informed Plaintiff via email that he was "fine tuning" a new operating agreement, and "setting up a new entity" where the 5

individuals offered equity would also become members of a new LLC and receive "25% of the net profits of the operating companies (JFA, IP (et al), JFS)."

47. In the same email, dated October 15, 2012, Mr. Finn stated that he expected the "paperwork to be completed by year end."

48. Upon information and belief, the contract that set forth Plaintiff's (and the other individuals) entitlement to the 25% net profits of the operating companies was in fact completed at or around year end of 2012.

49. The 25% profit sharing was split evenly amongst the Plaintiff, Mike Leiba, Celeste Jackson, Steve Boyle, and David Reynolds, with each to receive 5%.

50. According to the same October 15, 2012 email, Mr. Finn stated that "things are looking good for this q[uar]t[e]r and into the 1st quarter" and that it was "reasonable to expect a 5% payout in January based upon the actuals."

51. The profit-sharing agreement was in addition to the equity agreement and was set forth in writing in the same contract that detailed the equity agreement.

52. As such, Plaintiff was entitled to 5% of the net profits for the operating companies – Greenslate, JFA and JFS – from 2012 until he resigned in October 2018.

53. Upon information and belief, in 2012 and 2013, Plaintiff was not paid out the full 5% profit sharing that he was contractually entitled to.

54. Specifically, in 2012 Plaintiff was paid out about $12,000 in profit sharing.

55. Upon information and belief, this did not equal the 5% profit sharing he was entitled to for 2012.

56. Specifically, the other four (4) individuals, each of whom were entitled to the same 5% profit sharing, were paid out more in profit sharing in 2012 than Plaintiff was.

57. Similarly, in 2013 Plaintiff was paid out about $37,000 in profit sharing.

58. Upon information and belief, this did not equal the 5% profit sharing he was entitled to for 2013.

59. Specifically, the other four (4) individuals were again paid out more in profit sharing in 2013 than Plaintiff was.

60. None of the other four (4) individuals – David Reynolds, Mike Leiba, Celeste Jackson, and Steve Boyle – were entitled to more profit sharing than Plaintiff.

61. From 2014 through 2017, Plaintiff was not paid any profit sharing, despite continuing to remain contractually entitled to 5% of the net profits of Defendants "operating companies."

62. Upon information and belief, 5% of the net profits for Defendants "operating companies" for 2014, 2015, 2016 and 2017 totales approximately $400,000.

63. As such, Plaintiff is owed, pursuant to his written and verbal contractual agreement, over $400,000 in unpaid profit sharing.

64. Plaintiff only recently became aware of the fact that he was underpaid his 5% of the profit sharing in 2012 and 2013 and that the other four (4) individuals entitled to profit sharing pursuant to the same agreement were paid out more money.

**Defendants Failed to Pay Plaintiff his Deferred Compensation Owed in September 2018.**

65. Plaintiff and Defendants entered into a valid and binding employment contract on October 28, 2014, which was for a four-year period, which started on September 1, 2014.

66. This contract was an extension of Plaintiff's prior written employment contracts with Defendants.

67. The parties mutually agreed to the terms and conditions of the employment contract and each party signed the contact before a notary public.

68. According to the terms of the contract, it "shall be extended on the same terms and conditions as herein provided for any additional period of one year unless either party gives written notice to the other party, thirty days prior to the termination date, that the party does not wish to extend th[e] Agreement for the additional period.

69. As such, the terms and conditions set forth in this employment contract remained in full force and effect until Plaintiff's last day of employment with Defendants in October 2018.

70. Pursuant to his employment contract's "Retention Program", Plaintiff was offered and accepted a deferred compensation agreement whereby he would be entitled to $25,000 for each year the agreement was in effect and for each year in which the agreement was renewed.

71. As consideration for the $25,000 deferred compensation, Plaintiff agreed to remain employed by Defendants through September 1st of each year of employment.

72. Pursuant to the agreed upon terms of the deferred compensation arrangement, the deferred compensation vested and became available to Plaintiff on September 1st of each respective year of employment provided that Plaintiff had not left the employment of Defendants for any reason other than cause.

73. Plaintiff was employed through October 2018.

74. To date, Defendants have not paid Plaintiff the deferred compensation that had vested and become available to Plaintiff as of September 1, 2018.

75. Defendants' failure to pay Plaintiff the $25,000 in deferred compensation is a breach of his employment agreement and has caused Plaintiff damages in the amount of $25,000 plus interest.

76. Plaintiff had also already earned the $25,000 in deferred compensation.

77. The Defendants had no good faith basis for their failure to pay Plaintiff his $25,000 earned and non-discretionary retention bonus.

78. Plaintiff worked for Defendants through October 2018, and as such he was employed on and after September 1, 2018; which unequivocally means he had earned, and was entitled to the $25,000 retention bonus.

79. The failure to pay Plaintiff his earned wages resulted in a violation of the NYLL.

## FIRST CLAIM FOR RELIEF
### Breach of Written and Oral Equity and Profit-Sharing Agreement

80. Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

81. Plaintiff entered into an agreement with Defendants through which Defendants were to award Plaintiff five percent (5%) equity in the Companies and five percent (5%) profit sharing in the Companies in return for Plaintiff reducing his annual compensation by twenty percent (20%) until a time in which the Company was in better financial position.

82. Plaintiff complied with the agreement in all respects – specifically, he took the salary reduction for the period of time required by Defendants.

83. Defendants breached the agreement from the get-go. First, Defendants breached the contract by underpaying Plaintiff the five percent (5%) of the net profits that Plaintiff was entitled to in 2012 and 2013 and failing to pay any net profits to Plaintiff in 2014, 2015, 2016, and 2017.  Second, Defendants breached the contract by refusing to award Plaintiff his vested equity interest – 2.5% – in the Companies which vested on January 1, 2018 when Plaintiff was still employed by Defendants.

84. Defendants breaches caused Plaintiff lost profit sharing, which were contemplated by the parties at the time they entered into the contract, as well as lost ownership interest in the Companies, which was also contemplated by the parties at the time they entered into to the contract.

85. As a direct and proximate result of Defendants breach(es) of contract, Plaintiff was damaged in an amount to be determined at trial and should be awarded punitive damages as well.

## SECOND CLAIM FOR RELIEF
### Breach of Written Employment Agreement

86. Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

87. Plaintiff entered into an employment agreement with Defendants through which Defendants were to award Plaintiff a $25,000 retention bonus for every year he remained employed on September 1 of a given year.

88. In 2018, Plaintiff complied with the employment agreement such that he is entitled to his retention bonus – specifically, he remained employed by Defendants beyond September 1, 2018.

89. Defendants breached the employment agreement's retention bonus provision in 2018 when they failed to pay Plaintiff his $25,000 earned and non-discretionary bonus.

90. Defendants breaches caused Plaintiff to lose his 2018 retention bonus, which was contemplated by the parties at the time they entered into the employment agreement

91. As a direct and proximate result of Defendants breach of the employment agreement, Plaintiff was damaged in the amount of $25,000 and should be awarded punitive damages as well.

## THIRD CLAIM FOR RELIEF
### Failure to pay wages in violation of Sections 190-198 of the New York Labor Law

92. Plaintiff hereby repeats and realleges each and every one of the above-references allegations as if fully set forth herein

93. Plaintiff was an "employee," and Defendants are an "employer," pursuant to Section 190 of the New York Labor Law.

94. In 2018, Defendants failed to pay Plaintiff his earned, and non-discretionary retention bonus, which are "wages," as defined in Section 190 of the New York Labor Law, for work he performed as an employee of Defendants.

95. Defendants had no good faith basis for their failure to pay Plaintiff his earned and non-discretionary retention bonus of $25,000, which Plaintiff earned by remaining employed by Defendants through September 1, 2018.

96. Plaintiff is entitled to all of his unpaid wages and an additional one-hundred percent (100%) of the unpaid wages pursuant to New York Labor Law Section 198(1-a).

## FOURTH CLAIM FOR RELIEF
### Quantum Meruit

97. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if set forth in full herein.

98. Plaintiff fully performed his services in good faith to Defendants.

99. Defendants accepted the services rendered by Plaintiff.

100. Plaintiff worked for Defendants, even during the period of time that his salary was reduced, in an expectation of reasonable compensation – in the form of equity and profit sharing – for his services.

101.  A statement of the reasonable value of Plaintiff's services has been alleged above, as reasonably modified by the application of market rates for comparable services.

## FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**

102.  Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

103.  Defendants were enriched by the faithful services Plaintiff provided to them for several years.

104.  Defendants were enriched at Plaintiff's expense, because his working life during this period was devoted full time to the Defendants' needs and he had no time or opportunity to engage in other employment.

105.  It would be against equity and good conscience to permit Defendants to retain all the benefits of Plaintiff's services without providing him reasonable compensation, including full payment of his agreed upon bonuses, profit sharing, and equity in the Companies (a 2.5 % vested interest stake in the Companies).

## SIXTH CLAIM FOR RELIEF
**Declaratory Judgment**

106.  Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

107.  In the event the Court should determine that the relief requested for any of the above claims not be available, in whole or in part, Plaintiff respectfully requests that the Court declare that Plaintiff's equity rights were violated and that the equity agreement has been breached and that at the time in which equity distributions are made, Plaintiff will be entitled to his percentage ownership in the Companies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

(i) An award to Plaintiff for his actual damages in an amount to be determined at trial;

(ii) An award to Plaintiff of compensatory damages (expectation and consequential) in an amount to be determined at trial;

(iii) An award of punitive damages to deter future conduct by Defendants, in an amount to be determined at trial;

(iv) All available equitable remedies, including, but not limited to, specific performance;

(v) An award to Plaintiff of the costs of this action, including reasonable attorneys' fees to the fullest extent permitted by law; and

(vi) Such other and further relief as deemed necessary and proper

Dated: November 8, 2018
New York, New York

Respectfully submitted,

_____
Christopher Q. Davis, Esq.
Rachel M. Haskell, Esq.
The Law Office of Christopher Q. Davis
225 Broadway, Suite 1803
New York, NY 10007
646-430-7931 (direct)
646-430-7930 (main)
646-349-2504 (fax)